PATRICIA KRAJNIAK *v.* DR. GEORGE C. WILSON, SUPERINTENDENT, UNCAS-ON-THAMES HOSPITAL, ET AL.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued October 10—decided October 29, 1968

*Kalmen London,* with whom, on the brief, were *David Brown* and *Robert A. Michalik,* for the appellant (plaintiff).

*Robert L. Hirtle, Jr.,* assistant attorney general, with whom were *F. Michael Ahern,* assistant attorney general, and, on the brief, *Robert K. Killian,* attorney general, for the appellees (defendants).

KING, C. J. The plaintiff, Patricia Krajniak, applied for a position as a licensed practical nurse at the Uncas-on-Thames Hospital, which is owned and

operated by the state of Connecticut. Dr. George C. Wilson, one of the defendants, was the superintendent of Uncas-onThames and admittedly the "appointing authority" under § 5-43 of the General Statutes. In the afternoon of July 5, 1965, the plaintiff was interviewed and underwent a physical examination. Thereupon, she was told that she was hired and was asked to report for work on the afternoon of the next day and actually commenced work then at 3 p.m.

The plaintiff's work was satisfactory during the first three months of a six-month working test period which had been established for her job by the state personnel director under General Statutes § 5-43. Thereafter, by constant complaint about the volume of work and her inability to keep up with it, she manifested a lack of capacity to do the work, and her service rating report, prepared by the nurse in charge and approved by the nurse supervisor and by the director of nursing, set forth the plaintiff's shortcomings in considerable detail and reached the conclusion that the plaintiff was not capable of satisfactorily performing the duties required by her job. Dr. Wilson talked with the nurse supervisor and had her confirm the service rating report before he himself signed it on January 4, 1966.

On January 5, Dr. Wilson telephoned the plaintiff asking her to come to his office, which she did at 4 o'clock in the afternoon. At that time, Dr. Wilson handed her a letter which he had written informing her of her unsatisfactory service rating and closing with the statement that "you are dropped from the State service during your probationary period and effective this date".

The plaintiff's main contention is that Dr. Wilson's power to drop her from her employment if she

was unable or unwilling satisfactorily to perform the duties of her job existed only during the working test period; that it was not exercised within that period; and that for that reason she ipso facto acquired a permanent status as an employee under the State Employment Act (General Statutes, c. 63), entitling her, under General Statutes §§ 5-56 and 5-60, to certain rights, including a hearing before the personnel appeal board, in the event of her dismissal from state service.

Actually, she did apply for a hearing before the personnel appeal board, which dismissed her appeal for lack of jurisdiction on the ground that her discharge on January 5, 1966, was within the "working test period", that consequently the plaintiff never attained a permanent status, and therefore that she was not entitled to an appeal.

Under the plaintiff's theory of the case, the first question is whether she was dropped by Dr. Wilson during the working test period or whether, as she claims, she was dropped after the expiration of the working test period.

Regulation 1.4, entitled "Working Test Period", provides: "Each appointee to a permanent position in the classified service shall serve a working test period of six months. . . . If the position is noncompetitive, the working test period shall begin on the date of original permanent appointment."[1] Conn. Civil Service Commission Regs. (1961).

The plaintiff claims that, since her position was admittedly noncompetitive, the working test period

---

[1] Of course, there was, and could be, no "permanent" appointment in the sense of an appointment which could confer upon the plaintiff a permanent status at the outset of her employment. Neither side places any reliance on the use of the word "permanent", and we can ignore it as an inadvertent ambiguity in draftmanship, irrelevant to the present controversy.

began on the date of her original appointment. The defendants seem to agree that the date of the original appointment must mean the date of actual hiring, and there is no dispute that a fraction of a day is to be considered as a whole day. *Sands* v. *Lyon,* 18 Conn. 18, 26. Thus, the working test period commenced on July 5, 1965, and the effect of the regulation was clearly to render inapplicable our usual rule "that the day of the date, or the day of the act from which a future time is to be ascertained, is to be excluded from the calculation". *Austin, Nichols & Co.* v. *Gilman,* 100 Conn. 81, 83, 123 A. 32.

There is no question that the working test period of six months means a period of six calendar months. General Statutes § 1-1; *Strong* v. *Birchard,* 5 Conn. 357, 360. Obviously, six calendar months refers to a period of time and not to specific months as named in the calendar.

A period of time of one calendar month, if the first day of that period is the first day of the calendar month, would terminate at the end of the last day of that calendar month rather than at the end of the first day of the next succeeding calendar month. Correspondingly, if the first day of the period is other than the first day of the month, such as July 5 in the present case, the period of one month would terminate at the end of August 4 rather than at the end of August 5. The same rule applies where the period, as here, consists of several months. Thus, in the instant case, since the period of six months began on July 5, 1965, it expired at the end of January 4, 1966. *Brown* v. *Omaha,* 179 Neb. 224, 226, 137 N.W.2d 814; *In re Lynch's Estate,* 123 Utah 57, 58, 254 P.2d 454; 86 C.J.S. 840, 841, Time, § 10.

Because of the quoted regulation fixing the first

day of her working test period as July 5, the plaintiff is correct in her claim that her working test period terminated on January 4, 1966. Quite properly, she makes no point of the fact that January 3 and 4 were days off for her. This was immaterial in the computation of the period as were intervening, nonterminal Sundays or legal holidays. See *Lamberti* v. *Stamford,* 131 Conn. 396, 401, 40 A.2d 190.

The letter handed to her by Dr. Wilson on January 5, and which bore that date, stated that she was "dropped from the State service . . . effective this date". Thus, the date of dismissal was January 5, which was the day next following the day at the end of which the working test period expired.

The next question is what, if any, effect this delay in dropping the plaintiff had upon her status as an employee. She claims that the delay ipso facto conferred upon her a permanent status in the classified service. But regulation 1.41 provides that "[a]n employee shall attain permanent status in the class upon satisfactory completion of a working test period". Although the plaintiff completed her working test period, it was in such an unsatisfactory manner that Dr. Wilson dropped her.

Regulation 1.42 provided that, if the service rating report, which clearly was fully executed during the working test period, indicated that the plaintiff did "not merit permanent appointment, . . . [her] services shall be terminated". Thus, Dr. Wilson was required to terminate the plaintiff's services, which was what he did.

The provision in General Statutes § 5-43 permitting Dr. Wilson to drop the plaintiff "during the working test period" cannot be distorted into a prohibition against dropping her one day after the

expiration of the working test period.[2] Although the decision as to fitness for advancement to permanent status should be made, and communicated to the employee, within a reasonable time, and preferably before the expiration of the working test period, we cannot hold, as the plaintiff claims, that a one-day delay transforms unsatisfactory work and an inability to perform the duties of her job into satisfactory work and an ability to perform the duties of her job so as to qualify her under regulations 1.41 and 1.42 for a permanent status.

It is true that the provisions of General Statutes § 5-43 indicate that Dr. Wilson should have notified the personnel director of the plaintiff's unfitness for permanent appointment "[w]ithin ten days preceding the termination of the working test period." It is not clear from the record that the director was so notified until January 6. But there is nothing in the statute or elsewhere to indicate that such a short delay on Dr. Wilson's part in notifying the personnel director, even if there was such a delay, would ipso facto raise the plaintiff to a permanent status in the face of regulations 1.41 and 1.42.

We conclude that the plaintiff never attained a permanent status and, so, is entitled to none of the relief which she seeks in this action.

There is no error.

In this opinion the other judges concurred.

---

[2] Of course, as the testimony shows, Dr. Wilson supposed that the plaintiff's working test period commenced on July 6, which was the day she started work. But the regulation clearly fixed the first day of the working test period as the fortuitous date of actual hiring. See General Statutes § 5-42; Conn. Civil Service Commission Regs., No. 1.4 (1961). While it is difficult to understand why such a regulation should have been promulgated, the fact remains that the regulation controls, and the plaintiff is entitled to take advantage of it.